EMILE C. DEStUBNER *v.* UNITED CARBON COMPANY, INC.,

MICROID PROCESS, INC.

(Nos. 9508 and 9509)

Submitted October 19, 1943.  Decided December 7, 1943.

Fox and ROSE, JUDGES, dissenting.

*Rummel, Blagg & Stone,* for plaintiffs in error.
*Davis & Painter,* for defendants in error.

RILEY, PRESIDENT:

Emile C. deStubner filed his notice of motion for judgment in the amount of $37,111.61, with interest thereon, in the Circuit Court of Kanawha County, against the corporate defendants, United Carbon Company, Inc., and Microid Process, Inc. The circuit court heard the case on pleadings and proof in lieu of a jury, and rendered judgment in favor of the plaintiff against both defendants in the total amount sought, to which judgment these writs of error are prosecuted.

For convenience defendant, United Carbon Company, Inc., will be designated in this opinion as "United, Inc." and Microid Process, Inc., "Microid".

This case is a sequel of a suit in equity instituted in said circuit court by plaintiff against the defendants and United Carbon Company, a corporation, in which plaintiff, by his original and amended and supplemental bills of com-

plaint, sought to have cancelled three certain agreements, dated July 31, 1936: (1) An exclusive license agreement of deStubner to Microid, Inc., of all of plaintiff's patents, inventions and processes in the fields of black and color pigments with the right to sub-license; (2) an exclusive and non-assignable sub-license agreement of Microid to United, Inc., covering all of plaintiff's patents, inventions and processes in the field of black pigment; and (3) an agreement between deStubner and Microid reciting the succession of United, Inc., to the rights of United Carbon Company under a prior agreement of option for one year between deStubner and United Carbon Company, dated May 1, 1934, which agreement was extended until its exercise by United, Inc., on July 31, 1936. On certificate this Court affirmed the ruling of the circuit court in over-ruling defendants' several demurrers to the bill of com-plaint (*deStubner* v. *Microid Process, Inc., et al.*, 121 W. Va. 773, 6 S. E. 2d 777), but later reversed in part, affirmed in part, and modified the decree of the circuit court entered on final hearing, by cancelling the license agreement of deStubner to Microid in the field of colors on the ground that it was insolvent, and substituting, under the provisions of the deStubner-Microid agreement, plaintiff as licensor in lieu of Microid, in the sub-licensing agreement of Microid to United, Inc. (*deStubner* v. *Microid Process, et al.*, 124 W. Va. 591, 21 S. E. 2d 154.)

The instant proceeding upon notice of motion for judgment involves the same three agreements and series of negotiations preceding them which we considered in the cases above cited. We do not deem it necessary to relate the negotiations which eventually resulted in the execution of the three agreements dated July 31, 1936, but it is essential, we think, to set out those portions of each of the agreements which pertain to the questions under ap-praisement upon this writ of error. It is noted that while these contracts are all dated July 31, 1936, actually they were executed on August 18, 1936. We proceed to detail the relevant portions of the contracts:

## The deStubner-Microid license agreement

By the agreement between plaintiff and Microid there was granted to the latter "a non-assignable \* \* \* sole and exclusive license to use, together with the sole and exclusive right to sub-license the use of" plaintiff's patents, processes and inventions; and in consideration of three thousand shares of the Class "A" stock delivered to plaintiff, plaintiff was employed as director of technical research for a period of five years without salary, but with the right to terminate such employment if annual dividends on the Class "A" stock did not amount to twelve thousand dollars, unless someone on Microid's behalf supplied the monetary deficiency.

Under paragraph 3 (d) deStubner was required to "perform his service as director of technical research at such times and places as may reasonably be required by Microid" and he "may be discharged for cause if he becomes physically or mentally incapacitated or refuses or fails to perform faithfully and diligently the duties of his office."

Paragraph 5 provided two grounds for termination of the license: "(a) by an adjudication of bankruptcy or insolvency of the licensee; or (b) if during the period of any year beginning on the 1st day of August the dividends paid on the 'A' stock of Microid, plus such funds as may be paid to the holder of such stock, or ratably to all holders if there be more than one, shall not equal the sum of Twelve Thousand Dollars ($12,000), provided that during the year beginning August 1, 1936 such termination shall not become effective if the dividends so paid on the 'A' stock, plus such additional funds as may be paid pursuant to this agreement, shall equal the sum of Seven Thousand Five Hundred Dollars ($7,500)"; but the succeeding paragraph limited the right to terminate for the latter reason only if "deStubner or his personal representatives or assigns shall give to Microid sixty (60) days' notice in writing of the election to make such termination effective, and during such sixty (60) day period Microid or any one on its behalf shall fail to have paid to the

person or persons entitled thereto the amount necessary to make up said annual sums" of seven thousand five hundred dollars or twelve thousand dollars, as the case may be.

### The Microid-United, Inc. Sub-license Agreement

In the Microid-United, Inc. agreement the former granted United, Inc., an exclusive license to use and to sub-license to others the use of all of plaintiff's patents and inventions, under which Microid has the right to grant such license for the treatment of carbon black or other pigments.

### The deStubner-United, Inc. Agreement

The agreement between deStubner and United, Inc., recites the organization and incorporation of Microid and provides, among other things, that the first twelve thousand dollars of dividends shall be paid to the holder of Class "A" stock; that the expenses of prosecuting plaintiff's patent applications shall be borne by Microid; that the board of directors by a majority vote shall determine the extent of expenditures; and that "Should Microid not have funds available for the purpose, United, so long as it retains the right to use a license, bearing even date herewith granted by Microid to United, shall advance the funds necessary to pay * * * such expenses as Microid shall have incurred by order of its board of directors."

Paragraph 4. provides that the board of directors of Microid shall consist of three members, two to be selected by the holders of "B" stock and one by the holders of "A" stock; and paragraph 7. provides:

"Contemporaneously herewith, United shall lend to Microid the sum of Two Thousand Dollars ($2,000) for working capital, which amount with interest at five per cent (5%) per annum shall be a credit upon royalties hereafter to become due from United to Microid. All other advances or loans made by United to Microid, unless otherwise agreed upon by unanimous vote of the board

of directors, shall be evidenced by the note or other obligation of Microid, payable on or before two (2) years after date with interest from date at five per cent (5%) per annum. These loans shall include such sums as United may advance to make up any deficiency in the dividends paid in priority on the 'A' stock, as well as any sums advanced for research, patent applications and legal expenses connected therewith, and expenses of patent litigation. United, at its option, may elect to treat such advances including interest, or any part thereof, as pre-paid royalties or license fees."

From the allegations of the notice of motion for judgment and the evidence adduced, it appears that on the same day that the three agreements were executed the board of directors of Microid passed the following resolution:

"RESOLVED, that the officers of the Company be, and they are hereby, authorized to borrow from United Carbon Company, Inc., such funds as may be necessary for the current operation of the Company, such borrowings to be in accordance with the provisions of the preincorporation agreement which is embodied in the by-laws of this Corporation.

"RESOLVED, that the officers of the Company be, and they are hereby authorized and directed to pay to Mr. deStubner the sum of Six Hundred and Twenty-five Dollars ($625) per month, as per contract, such payments to begin with the month of August, 1936, and to be made on or about the last day of each month."

On this day also, Oscar Nelson, president of Microid, wrote to deStubner a letter which, in part, is as follows:

"This letter is to evidence our understanding that the sums payable to you as or in lieu of prior dividends on the Class 'A' stock of this Corporation, heretofore issued to you as set forth in the written agreement between us dated July 31,

> 1936, are to be paid to you in equal monthly amounts on or before the last day of each month beginning in August, 1936."

Payments of such amount were made monthly by Microid until January, 1938. On February 22, 1937, United, Inc., advanced to plaintiff the sum of five thousand dollars as a loan to prosecute infringement suits against other parties. During 1937 deStubner became dissatisfied with the progress which defendants had made under the original contracts. After the payment on January 1, 1938, Microid, Inc., discontinued all payments, because of an alleged disagreement with plaintiff over the repayment of the five thousand dollar loan, and on May 21, 1938, plaintiff gave Microid a written notice of the cancellation of the deStubner-Microid license agreement of July 31, 1936, grounded upon paragraph 5 (b) thereof. Termination was to be effective as of August 1, 1938.

From January to April, 1938, plaintiff had been active in interesting the Charles Hellmuth Printing Ink Corporation in his patents, inventions and processes, embracing both black and color pigments, which eventually resulted in a one-year option agreement dated May 27, 1938. This agreement was in letter form signed by United, Inc., addressed to Charles Hellmuth Printing Ink Corporation, approved by deStubner and Microid, and accepted by Hellmuth. The agreement provides in part:

> "E. C. deStubner will cooperate with you in the development of dispersions suitable to each subject matter for transpersions"

and

> "We both agree to review with each other the entire subject at least every sixty days and cooperate fully in determining ways and means for continuously and effectively progressing with each and all the developments to our mutual interest and advantage";

and

"During said period we agree to furnish the concentrated dispersions as specified by you * * *".

The Hellmuth agreement further provides:

"You will understand that in calculating the amount of money which we shall have expended as aforesaid, there will be included the amount of the loss of Microid Process, Inc., and the United Carbon Company, Inc., by reason of their relations with Colloidal Pigment, Inc., and that *after this date it will be necessary to make further expenditures* for prosecution of patent applications, *payments to Dr. deStubner, * * *"*. (Italics supplied)

In reply to the trial court's inquiry directed toward the language "payments to Dr. deStubner", Nelson replied, "That was the monthly payments which we were obligated to pay each month, and had nothing to do with the contracts."

Shortly after the execution of the Hellmuth option, on July 12, 1938, plaintiff and Microid, Inc., entered into an agreement which provided:

"1) deStubner hereby withdraws the notice of cancellation of a certain agreement dated July 31, 1936 between himself and Microid and reinstates said contract of July 31, 1936 in full force and effect.

"2) In lieu of the payments specified in paragraph 3b of the said agreement of July 31, 1936, deStubner agrees to accept and Microid agrees to pay deStubner the sum of Six Hundred Twenty-five Dollars ($625.00) per month beginning August 1, 1937, and continuing until the exercise or termination of the option agreement given the Charles Hellmuth Printing Ink Corporation under date of May 27, 1938, provided, however, that upon the exercise or termination of said option agreement, *the schedule of payments specified in paragraph 3b of said agreement of July 31, 1936*

*shall be reinstated* as of the date of the exercise
or termination of said option agreement." (Italics
supplied).

Following the execution of the July 12, 1938, agreement
between plaintiff and Microid, the latter brought up to
date its monthly payments of six hundred twenty-five
dollars and continued to pay deStubner such sums until
on March 1, 1939, plaintiff gave to Microid written notice
of termination of the license agreement as of twelve
o'clock noon of the following day, which notice stated
eight grounds: (1) misrepresentation; (2) failure of con-
sideration; (3) failure to use plaintiff's disclosed inven-
tions; (4) failure to enforce the obligations of United,
Inc., regarding patents; (5) prevention of plaintiff from
performing his part of the agreement by excluding him
from the Bullitt Street laboratory, as of August 28, 1936;
(6) licensee's dispute of plaintiff's patents; (7) abandon-
ment of the license; and (8) Microid's insolvency. There-
after plaintiff particularized various of Microid's and
United Carbon's customers as to the severance of his re-
lationship with them; but the record does not contain such
a letter from plaintiff to Hellmuth.

On March 22, 1939, shortly before the expiration date
of the Hellmuth option, deStubner brought the afore-
mentioned suit in equity. This Court rendered its de-
cision on July 1, 1942, cancelling the deStubner-Microid
exclusive license in the field of colors on the ground of
Microid's insolvency, and substituted deStubner as li-
censor. The decree of this Court became final on August
1, 1942. The instant notice of motion for judgment was
filed on September 8, 1942.

Plaintiff's counsel take the position: (1) That there
arose an obligation, expressed or implied, resting upon the
defendants to pay deStubner seventy-five hundred dol-
lars a year for the first year, beginning August 1, 1936,
and twelve thousand dollars for each year thereafter, so
long as Microid retained its license and so long as United,
Inc., retained the rights under the sub-license agreement

of Microid to United, Inc.; and (2) if there is such an obligation it is not destroyed or barred by plaintiff's actions.

Under the deStubner-Microid agreement, Microid employed deStubner as director of technical research, without salary, but from a review of the instant record, it is apparent to us that some understanding must have been had among deStubner, Microid and United, Inc., for at the time the contemporaneous contracts of July 31, 1936, were executed, contracts which we held in the equity suit to be interlocking and concomitant agreements, Microid's board of directors passed a resolution authorizing the payment by Microid's treasurer of six hundred twenty-five dollars a month to deStubner "as per contract". The fact that this resolution was adopted by Microid at the very inception of the contractual relationship among deStubner, Microid and United, Inc., provokes us to conclude that without assurance of such monthly payments to deStubner the contracts executed by the interested parties would never have been effected. Although this conclusion is at apparent variance with the statement made in *deStubner* v. *Microid Process, supra,* 782, that deStubner "was without the assurance of any substantial compensation whatsoever", it is to be noted that this Court had before it then only the appraisement of a bill of complaint, and the resolution of July 12, 1938, and its pertinency to the instant issue were not before us.

Actually the payments directed by the resolution were paid through the first year of the agreement and until January, 1938. During this second year deStubner and Nelson disagreed over the requirements of payment under the July 31, 1936, agreement. On the one side deStubner asserted his right to receive a thousand dollars a month, while Nelson denied his right to receive more than six hundred twenty-five dollars a month. This dissension, coupled with the disagreement over the repayment of the five thousand dollar loan, brought about a cessation of payments, and finally prompted deStubner

to give his first notice of termination on May 21, 1938. It therefore seems clear that deStubner's position was that there was no reason for continuing the agreement of July 31, 1936, if remuneration was not forthcoming.

Under the terms of the deStubner-Microid agreement, the effect of the first notice of cancellation could have been avoided if someone in Microid's behalf made payment of the remuneration set forth in paragraph 5 (b) of said agreement, which, as we have already observed, was in terms of dividends payable to deStubner as the holder of the Class "A" stock of Microid. Microid itself, as Swartz testified, undertook to keep alive the contract by agreeing to pay deStubner six hundred twenty-five dollars a month until the Hellmuth option was terminated or exercised, after which the agreement provided that "the schedule of payments specified in paragraph 3 (b) of the said agreement of July 31, 1936, shall be reinstated * * *." Some significance must be attached to this agreement of July 12, 1938. As heretofore noted, after the notice of cancellation only the positive payment of dividends in the amount of twelve thousand dollars yearly, or payment by someone in Microid's behalf in lieu thereof, could have prevented termination. Since deStubner and Nelson had disagreed over the requirement of payments by Microid under the original contract, it is not reasonable to say that deStubner would have waived his notice of cancellation to enter into a modification of that agreement, which, after such modification, would have left unsettled the very controversy which occasioned termination in the first instance. Moreover, had it been the intention of Microid and deStubner that such uncertainty was again to exist, would not the contract of July 12, 1938, have provided that the provisions of paragraph 3 (b) relating to payment should be reinstated rather than "the schedule of payments specified" therein. In this regard it must be remembered that the contending parties were each represented by able counsel. This Court must assume in these circumstances that

the parties meant exactly what they said by the language used in the July 12, 1938, agreement. This contract, we think, in these circumstances lends itself only to a literal construction, a construction which gives to the wording its exact and full meaning.

Obviously, it was more to Microid's than to deStubner's interest that deStubner should not terminate his contract during the life of the Hellmuth option, for, under the terms of the deStubner-Microid license agreement whatever rights would have inured to Microid upon the exercise by Hellmuth of its option would revert to deStubner alone. Clearly it was to Microid's interest to indulge deStubner in his contention for monthly payments in order to keep its interest alive in the deStubner patents and processes in the hope that the exercise of the Hellmuth option would yield to it some measure of profit. That being so, we are constrained to hold that under the July 12, 1938, contract, Microid bound itself to pay deStubner from the termination or exercise of the Hellmuth option one thousand dollars a month so long as it held plaintiff's patents and processes under the deStubner-Microid agreement.

The circuit court, accepting the suggestion contained in the dissent to the decision of this Court on the final hearing in the equity case decided that Microid was the instrumentality of United, Inc. On this basis that court held that United, Inc., as guarantor was liable to deStubner to the full extent of the Microid liability. We cannot agree with this. The fact that Microid and United, Inc., had the same officers and that two of Microid's directors, Nelson and Swartz, were, respectively, the president and general counsel of both corporations controlling two-thirds of the Microid stock, does not justify this Court in disregarding the corporate entity of Microid. If we were permitted to do so there would be no substantial question as to United, Inc.'s liability for the full amount claimed. In the opinion rendered on the final decision in the equity case we held:

"The fact that a corporation has officers, directors, agents, and employees in common with another corporation does not, of itself, justify disregard of the entities of the two corporations." (Point 5, Syl.)

In the equity case this Court, applying the rule in *Atwater & Co. v. Fall River Pocahontas Collieries Co.*, 119 W. Va. 549, 195 S. E. 99, that corporate entities will be disregarded only where they are used to commit a fraud or a wrong, refused to apply the so-called instrumentality rule to the defendant corporations, because the record in that case, as does the instant record, contains no evidence of sufficient probative force to establish that defendants have committed a fraud or a wrong under the veil of their corporate entities.

In the appraisal of the question of the liability of United, Inc., it is to be noted that, except for the resolution providing that deStubner was to receive money derived from certain infringement suits, the only resolution disclosed by this record was the resolution of Microid's board of directors providing that plaintiff was to be paid six hundred twenty-five dollars a month, as per contract, beginning with August, 1936. The resolution was passed on the same day and evidently at the same conference of Nelson, Swartz and deStubner, the three directors of Microid, at which the contracts of July 31, 1936, were executed. Swartz testified at this conference that much time was consumed in the examination and execution of the papers. Swartz, as general counsel of both corporations, drafted the resolution and to a large extent drafted the contracts. The resolution, he testified, was "to authorize the treasurer of the Company [Microid] to make Mr. deStubner these payments as long as there were funds in the treasury with which to make them, or until and unless the Company, by its directors would order him to the contrary." Contemporaneously with the resolution and execution of the contracts, Microid by Nelson, its president, wrote deStubner: "This letter is

to evidence our understanding that the sums payable to you as or in lieu of prior dividends on Class 'A' stock of this Corporation [Microid] heretofore issued to you as set forth in the written agreement between us dated July 31, 1936, are to be paid to you on or before the last day of each month beginning in August, 1936." Thereafter, in conformity with the resolution and Microid's letter, deStubner was paid six hundred twenty-five dollars a month until payments were stopped early in 1938 as a result of the controversy over the repayment of the five thousand dollar loan. Early in August, 1938, as the result of deStubner's withdrawal of the first notice of cancellation, payments were resumed on the same basis and Microid paid deStubner thirty-seven hundred fifty dollars covering the six months period during which the six hundred twenty-five dollar monthly payments had been withheld. According to Swartz's testimony the controversy between plaintiff and Microid over the repayment of the loan involved the question whether deStubner was entitled to six hundred twenty-five dollars or one thousand dollars a month.

In determining whether there is any obligation on the part of United, Inc., to pay deStubner, all of the transactions which took place on August 18, 1936, must be meaningful. Initially, there is testimony that the contracting parties contemplated that during the experimental period dividends would not be forthcoming to deStubner as the holder of Microid's "A" shares. The resolution was passed by Microid directing monthly payments of six hundred twenty-five dollars, without limition as to time. Obviously, it was intended that the funds with which to pay deStubner would come from some source other than Microid and that the "some one" mentioned in the deStubner-Microid agreement in paragraphs 3 (b) and 5 (b) was United, Inc., for certainly at the inception of the contractual relationship the financial structure of Microid was not such as to assure payment by it of the monthly sums which its board of directors

agreed to pay deStubner. Were we to accept the argument of defendants that there was no obligation to pay deStubner any sum monthly, it would follow that the payments made by Microid to deStubner were either gratuities or loans. The record discloses that counsel for defendants regarded the payments as part of the consideration for the licenses and sub-licenses acquired by Microid and United, Inc., respectively. Had such payments been intended as loans, certainly deStubner would have been required to deliver some evidence of his obligation. The interpretative letter by Nelson under date of August 18, 1936, that the monthly payments were "as or in lieu of prior dividends on Class 'A' stock" is corroborative of the purpose of Microid and United, Inc., to pay deStubner a fixed monthly sum as an obligation on their respective parts. When it is considered that the obligation of United, Inc., in its contract with deStubner was to pay such *expenses* as Microid shall have incurred by order of its board of directors it is clear, we think, that the term "expenses" was intended to and did, in fact, under all the circumstances, include the monthly payments directed to be made by the resolution. "A word is not a crystal, transparent and unchanged; it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." *Towne* v. *Eisner,* 245 U. S. 418, 38 S. Ct. 158, 159, 62 L. ed. 372, 376. As heretofore observed, the resolution of August 18 contained no limitation as to time; the record does not disclose its revocation; and during all of the time Microid retained plaintiff's patents and processes subject to United, Inc.'s sub-license in the field of black pigments.

Both defendants, after notice of cancellation of May 1, 1939, resisted by separate letters plaintiff's effort to cancel.

By paragraph 6. it is provided that: "Should Microid not have funds available for the purpose, United, *so long as it retains the right to use a license,* bearing even date herewith granted by Microid to United, shall advance

the funds necessary to pay * * * such expenses as Microid shall have incurred by order of its board of directors." (Italics supplied.) In these circumstances it seems that United, Inc., became and was bound by express contract to pay plaintiff the sum of six hundred twenty-five dollars a month from August, 1936, until deStubner was substituted as licensor to Microid under paragraph (7) of the deStubner-Microid agreement when the decision of this Court in the equity suit became final on August 1, 1942. The fact that Microid is liable on the basis of one thousand dollars a month during the period of time in controversy in this proceeding, of course, does not justify this Court in imposing such liability upon United, Inc., as the latter's liability to deStubner under its contract with him cannot exceed the amount provided for in the resolution of August 18, 1936.

Under their special plea No. 3 defendants claim that they were relieved of liability to make further payments to plaintiff because plaintiff failed to cooperate with Hellmuth and because of the notice of cancellation of March 1, 1939.

We agree with the trial court "That there is no evidence in the record that the plaintiff failed to cooperate with Hellmuth during the option period." The record discloses, we think, that plaintiff was industrious in his efforts to render assistance in the furtherance of the Hellmuth enterprise before and during the option period. Notwithstanding the growing intensity of the controversy over the repayment of the five thousand dollar loan, which culminated in the cessation of any payment by Microid after January 1, 1938, and finally in the notice of cancellation of May 21, 1938, plaintiff for several months prior to the Hellmuth contract spent much time in endeavoring to interest Hellmuth in the patents and processes covered by the license agreement of July 31, 1936. In fairness it must be said that plaintiff was largely instrumental in bringing about the execution of the Hellmuth option.

Hellmuth's reliance upon deStubner is shown by the observation contained in the letter of Clarkson, Hellmuth's president, dated February 3, 1938, to the effect that the men who had been conducting the experiments at the Bullitt Street plant were not sufficiently informed, and that through conferences with deStubner, miscibility of certain oils with concentrates could be assured. The Hellmuth agreement itself provided that deStubner would cooperate with Hellmuth in the development of dispersions suitable to each subject matter of transpersion, and that United, Inc., would furnish the concentrate dispersions as specified by Hellmuth. Notwithstanding all this deStubner was advised by Nelson's letter of December 16, 1938, to remain available in New York and make any suggestions that he might have to Roberts who, the record discloses, was in charge of the Bullitt Street laboratory, and had been instructed by deStubner as to his processes. This letter was in reply to deStubner's letter informing Nelson of a favorable interview in New York with Hellmuth's chemist, in which letter deStubner stated that it was necessary for him to come to Charleston to prepare the concentrate or base, evidently the same which United, Inc., was to furnish Hellmuth under the agreement. During the option period plaintiff wrote Nelson protesting against the latter's failure to consult and give personal attention to the correspondence between them. He had frequent interviews with responsible representatives of Hellmuth as to the subject matter of the option contract. It is true, as defendants' counsel suggest, that after the second notice of cancellation, plaintiff particularized Microid's and United, Inc.'s customers as to his attempt to sever his relations with defendants, but no such letter appears in the record addressed to Hellmuth and the record does not disclose that any injury resulted from these activities. In fact the evidence introduced on behalf of defendants shows that the poundage of carbon black dispersions sold increased from 476,445 in 1939, as follows: 792,558 in 1940; 1,101,138 in 1941; and 907,562

during the nine months period from January 1 to October 1, 1942. We cannot, from this evidence, say that the trial court's finding of fact in this regard is clearly wrong. It therefore must be sustained.

Moreover, both defendants, after receiving the notice of March 1, 1939, resisted cancellation as shown by their letters of March 14, 1939, and elected to, and did retain, plaintiff's patents and processes. In these circumstances, especially in view of the absence of resultant injury, we think that defendants are not justified in their position that plaintiff's lack of cooperation constituted a breach of the agreement of July 12, 1938. *Victory Bottle Capping Machine Co.* v. *O. & J. Machine Co.* (C. C. A. 1), 280 F. 753, 761; *Rosenthal Paper Co.* v. *National Folding & Box Paper Co.*, 226 N. Y. 313, 123 N. E. 766.

But defendants' counsel say, as they have asserted in their special plea No. 2, that plaintiff's attempted cancellation of March 1, 1939, being prior to the termination of the Hellmuth option, which was terminated on May 26, 1939, by the expiration of the one-year period, breached the contract of July 12, 1938. As to the reasons which prompted deStubner to take this action, we need not be concerned. Whether he was justified, the facts remain that notice of cancellation was not accepted by defendants, the attempted cancellation was resisted, and the subject matter of the licenses retained; and if the notice was premature that did not constitute a breach of the contract because defendants did not accept plaintiff's action as a breach, they incurred no injury as the result thereof, and the record does not disclose that they altered their position in the least.

In the case of *Duer* v. *Chicago Coach & Carriage Co.*, 194 Ill. App. 314, it was held that where on the filing of a bill of complaint by a licensor for the cancellation of a patent license agreement, licensee denies plaintiff's right to rescind and asserts that the license is in full force and continues thereunder for more than a year before assenting to cancellation, the licensee was required to account

for royalties paid to the time of such assent. This case was cited by the circuit court in its written opinion for the proposition "that the filing of a bill for the cancellation of a license to manufacture a patented article and to recover royalties does not deprive the licensor of the right to an accounting for royalties accruing until the cancellation of the license by decree or formal assent of the licensee." Generally a licensee may not refuse to pay royalties under a patent license agreement until he has, in fact, surrendered his rights to the licensor. *Wilcolator Co.* v. *Robertshaw Themostat Co.* (D. C. W. D. Pa.), 26 F. Supp. 255; *Barber Asphalt Paving Co.* v. *Headley Good Roads Co.* (D. C. Del.), 284 F. 177; *Marston* v. *Swett*, 66 N. Y. 206, 23 Am. Dec. 43; *Victory Bottle Capping Machine Co.* v. *O. & J. Machine Co., supra;* all of which cases are cited by the circuit court in the written opinion. Because we think, as heretofore suggested, that under the contracts of July 31, 1936, the resolution of August 18, 1936, and the contract of July 12, 1938, defendants were under an unconditional promise to pay fixed sums, the foregoing cases are in point and thoroughly support plaintiff's theory of the case as to the effect of the giving of the second cancellation notice and the bringing of the equity suit prior to the termination date of the Hellmuth option period.

The record, we think, does not sustain the position of defendants' counsel that because both the bill and answers in the equity suit admitted insolvency plaintiff should not be entitled to payment after he had the opportunity, with the filing of the answers, to ask for a decree of cancellation of the deStubner-Microid license agreement on the ground of insolvency. On this question it seems important to note: (1) That the notice of cancellation of March 1, 1939, asserted Microid's insolvency as a ground for cancellation and cancellation based upon that notice, as shown by defendants' letters of March 14, 1939, was resisted before the equity suit was brought; (2) defendants' answers admitting Microid's insolvency were filed

long after the filing of the bill of complaint charging the same; (3) the answers, though admitting Microid's insolvency, deny categorically plaintiff's right to cancel on that ground; (4) both answers pray for a dismissal of plaintiff's bill of complaint without affording him any relief; and (5) paragraph 5(a) of the deStubner-Microid agreement provided for cancellation upon the ground of Microid's insolvency only upon the adjudication thereof (deStubner v. Microid Process, Inc., supra, 789), and such adjudication was not had until the final decree in the equity suit on July 19, 1941, which decree did not become final until the mandate of this Court on appeal had therefrom on August 1, 1942. In the meantime defendants had retained plaintiff's patents and processes, and had produced, marketed and sold products derived thereunder at a profit. Morever, defendants had an equal opportunity with plaintiff to ask for a decree on the question of insolvency based upon the bill and answer, but they did not do so; but, on the contrary, they elected to retain the patents and processes until the equity suit was finally decided by a decision adverse to them so far as it involved the deStubner-Microid agreement.

Plaintiff's notice of motion for judgment asserts liability against both of the corporate defendants on the basis of the original contracts of July 31, 1936, the resolution of Microid's board of directors of August 18, 1936, and the contract of July 12, 1938, withdrawing deStubner's first notice of cancellation providing for payments to deStubner at six hundred twenty-five dollars a month until the Hellmuth option is exercised or terminated and thereafter the reinstatement of the schedule of payments contained in paragraph 3(b) of the Microid-deStubner license agreement. It is sufficiently broad in its allegations to permit the assertion of liability against both corporations on the basis of an express contract. But what judgment should be entered by this Court? The case, having been heard by the circuit court in lieu of a jury and this Court being of the opinion that the judgment

of the circuit court should be reversed, is under the duty to enter whatever judgment the circuit court should have entered. Where in a law action the parties waive a jury trial and the case is submitted to the trial court on the law and the facts, this Court is required under our practice to treat the case as upon a demurrer to the evidence, and if plaintiff's evidence is insufficient to support the finding and judgment of the trial court the judgment should be reversed and judgment entered here. *Labelle Iron Works* v. *Quarter Savings Bank*, 74 W. Va. 569, 570, 82 S. E. 614; *Enos, Hill & Co.*, v. *Stansbury*, 18 W. Va. 477. In the last-mentioned case this Court refused to enter different judgments in an action of assumpsit against two defendants upon a joint account. This Court observed that Section 19 of Chapter 131 of the Code of West Virginia (1861), which provides: "In an action founded on a contract against two or more defendants, although the plaintiff may be barred as to one or more of them, yet he may have judgment against any other or others of the defendants, against whom he would have been entitled to recover, if he had sued them only", did not cover a situation where: "If a declaration in *assumpsit* be filed against two defendants jointly containing the common counts, and a bill of particulars be filed purporting to be an account against both defendants jointly, but on the trial of the case on the plea of *non assumpsit* the evidence shows that only a part of the items in the bill of particulars are charges against the two defendants jointly, and that the other items are charges against one of the defendants individually * * *". Pt. 3, syl., *Enos, Hill & Co.* v. *Stansbury, supra*. In that case it was held that the jury could only find a verdict on the items of the account upon which the defendants were jointly liable. This section of the Code, as amended, is now contained in Code, 56-6-32; but, as amended, the permissive features of the statute have not been enlarged so as to change the principle announced in *Enos, Hill & Co.* v. *Stansbury, supra*. Under that decision and our view of the instant case judgment

should be entered here against Microid and United, Inc., for six hundred twenty-five dollars a month beginning March 31, 1939, until and including July 31, 1942, with interest upon each installment at six per cent per annum from the date when payment should have been made to the date of the entry of the judgment here, less the following credits which are set forth in plaintiff's bill of particulars: (1) The sum of three thousand two hundred fifty dollars, representing the balance due on the principal sum of the five thousand dollar loan, with interest at the rate of six per cent per annum on five thousand dollars from May 22, 1937, to March 15, 1938, and like interest on said balance of three thousand two hundred fifty dollars from March 15, 1938, to the date of judgment here; and (2) the sum of nine hundred eighty-seven dollars and ten cents representing the amount paid by defendants to Arthur M. Smith with interest at the rate of six per cent per annum from November 1, 1937, to the date of judgment here.

*Affirmed in part; reversed in part;*
*Judgment entered here.*

Rose, Judge, dissenting:

I can find no basis in the record for the recovery allowed by this Court in favor of the plaintiff.

It is perfectly clear and apparently conceded by all, that the three written agreements of July 31, 1936, do not obligate the defendants, or either of them, to pay the plaintiff anything. These contracts merely stipulate that unless the plaintiff shall be paid, by way of dividends or otherwise, the amount of $7,500 for the first year and $12,000 for each year thereafter, he may, at his election, terminate the license for his patents. The books indicate that similar provisions in patent license agreements are common. No case is found, however, holding that such a provision makes such payments obligatory on the licensee. In this State we have long been familiar with a precisely parallel provision common in oil and gas leases, providing

for the termination of the lease at a fixed time if a well is not then completed, unless a stipulated sum be paid to the lessor. This provision we have held to create no obligation upon the lessee to make these payments. *Smith v. South Penn Oil Company,* 59 W. Va. 204, 53 S. E. 152; *Lowther Oil Company* v. *Guffey,* 52 W. Va. 88, 43 S. E. 101; *Snodgrass* v. *South Penn Oil Company,* 47 W. Va. 509, 35 S. E. 820. Therefore, if the plaintiff has any right of recovery against these defendants, or either of them, we must find it, not in these three formal agreements but elsewhere. The plaintiff claims that this right can be extracted from the resolution adopted by the board of directors of the defendant Microid Process, Inc., on the 18th day of August, 1936.

It is perfectly obvious, however, that this resolution, standing alone, creates no actionable right in the plaintiff. He is not a party thereto; he neither gives nor promises anything in consideration thereof; the resolution in no manner binds him to do or refrain from doing anything. The resolution, in itself, is nothing but an *ex parte* act of the corporation. It merely directs the proper officers of the corporation to make certain payments "as per" a certain contract. This at most is a mere routine internal and private proceeding of the corporation, which in no manner purports to create any new contractual relation with any person, but only directs performance of an act which can, or must be done under a contract already in existence. The plaintiff apparently does not contend that the resolution in and of itself would vest in him any right of action. His theory of recovery is that this resolution is a part of a more comprehensive contract between himself and the defendants by which a right of action in him against the defendants is created. This claim would seem to fail for four distinct reasons.

(1) The resolution of the directors of Microid Process, Inc., to pay "as per contract" does not, in itself, create a contract on which payments are to be made. The contract on which these payments are to apply must

still be ascertained, and the character and effect of the payments when made, or when bound to be made, will be determined by that contract. *International Finance Corp. v. Calvert Drug Company*, 144 Md. 303, 124 A. 891; *Culbreath v. Guiterman, Rosenfield & Company*, 217 Ala. 259, 115 So. 303; *Continental Bank & Trust Company v. Times Publishing Company*, 142 La. 209, 76 So. 612; *Gisborn v. Milner*, 28 Utah 438, 79 P. 556; *Close v. Burlington C. R. & N. Railway Company*, 64 Io. 149, 19 N. W. 886.

On what contract were the payments directed by the resolution to be paid? There is only one contract discoverable in the record, any provision of which mentions payments to which the payments stipulated in the resolution will in any wise conform. That is that part of the agreement by which the license is made revocable at the plaintiff's election unless dividends or payments in lieu thereof to the amount of $7,500 are made for the year ending August 1, 1937. Indeed, the odd amount of the monthly payments would seem to have been determined by resolving the payment of $7,500 into twelve equal parts. That agreement does not state when, or in what amounts, this sum shall be paid. The monthly payments stipulated for in the resolution, however, will in the year precisely equal this sum. It must be concluded, therefore, that these payments were intended to make up the said sum of $7,500 and nothing else, and that when that sum is paid the monthly payment should cease. After the expiration of this year there are no payments, either binding or optional, which will be discharged by the monthly payment of $625. After August 1, 1937, to prevent cancellation of the license the sum of $12,000 must be paid each year. The payment of $625 per month after that date will be utterly futile. Such payments, if made, would procure the payor nothing, and will in no way bind the payee. The payments mentioned in the resolution were to be made not as a gratuity, but "as per" some contract under which they would be effec-

tive for some purpose. No such contract, or portion of any contract, can be found except that covering the year from August 1, 1936, to August 1, 1937. The defendants having made all the $625 payments which can be made "as per" any contract, their obligation to pay further like sums ended.

It is true that certain payments of $625 per month were made to deStubner after the expiration of the first year, but these were promptly suspended when it became apparent that the parties were not agreed as to the liability for, and effect of, these payments. They were not resumed until the execution of the contract of July 12, 1938. It is also true that Nelson, in his correspondence with the Hellmuth Company, refers to payments which his company was obligated to make to deStubner, but this indicates nothing as to whether these payments were optional or obligatory. In either case, certain payments had to be made to deStubner in order to preserve the general license alive until the option to the Hellmuth Company might be exercised.

(2) By this new contract the whole matter of the payments to deStubner was covered. First, Microid Process, Inc., agreed to pay, and deStubner agreed to accept, instead of the $12,000 by way of dividends, or other payments in lieu thereof, the sum of $625 per month for the period between August 1, 1937, and the expiration or exercise of the Hellmuth option which extended one year from May 27, 1938. All these monthly payments have been made except those for March, April and May, 1939, and clearly the plaintiff would be entitled to a recovery for these instalments, with interest, were it not that he pleads and proves sets-off aggregating a much larger amount.

Second, the contract of July 12, 1938, states, with equal definiteness, the right of deStubner to payments after the expiration of the Hellmuth option. It says that "upon the exercise or termination of said option agreement, the schedule of payments specified in paragraph 3b of the

said agreement of July 31, 1936, shall be reinstated as of the date of the exercise or termination of said option agreement." That section reads as follows:

"deStubner shall receive no salary for his services as such director of technical research, but when and if the dividends paid on the "A" stock of Microid shall not amount to Twelve Thousand Dollars ($12,000) per year, deStubner shall be at liberty to terminate said employment unless some one on behalf of Microid shall pay to the holders of "A" the difference between the dividends actually declared and paid in such year on said "A" stock and said sum of Twelve Thousand Dollars ($12,000), provided that during the period of one (1) year following the date hereof the amount of dividends, to be so paid, shall be Seven Thousand Five Hundred Dollars ($7,500) instead of Twelve Thousand Dollars ($12,000)."

It is suggested that the expression "schedule of payments" means only the amount of payments. But a schedule of payments, to mean anything, must include also, time of payments, conditions and contingencies, affecting either time or amounts if there be such, and their character as optional or obligatory, otherwise the payments are not adequately described. See *Hutton* v. *Gill,* 212 Ind. 164, 8 N. E. 2d 818. The terms and conditions of payment are absolutely essential to determine when, how, and under what circumstances payments shall be made.

But, whether this in the correct construction of the phrase "schedule of payments" standing alone, it is made so by the following provision in the same contract:

"3. Except as above provided, the terms and conditions of said agreement of July 31, 1936, shall remain in full force and effect."

By this express language all the terms and conditions of the agreement of July 31, 1936, including section 3b, in regard to payments are directly and positively reaffirmed and continued in effect. No allusion is made to any rights

arising under any other agreement, or the resolution of the defendant Microid Process, Inc. Not only the "schedule of payments" in section 3b of the agreement of July 31, 1936, but all the terms and conditions of that agreement must henceforth prevail and control the problem of payments to deStubner. All the provisions of all other agreements in relation thereto are abrogated. All questions arising by prior dealings, arrangements and understandings between the parties are eliminated and all payments thereafter to be made are in accordance with section 3b of the agreement of July 31, 1936. Thus, any possible survival of the resolution of Microid Process, Inc., disappears. The payments in lieu of dividends thus assume their original character and again become wholly optional regardless of what they may have been in the interim, and will not sustain this or any other action on behalf of the plaintiff.

(3) The notice of cancellation with which he began his efforts to terminate his license to Microid Process, Inc., assigns eight grounds for the termination thereof, but not one of these is made a basis for cancellation by the license agreement. Even the insolvency of the licensee, assigned as one ground, is insufficient for that purpose. It is not insolvency alone but an "adjudication of insolvency" that creates the right of termination of the license. There had been no such adjudication. The notice, therefore, was nothing but a notification by deStubner of his intention to institute a suit for cancellation on the grounds mentioned, coupled with an invitation to negotiate for termination of the license by agreement. This invitation is in the notice itself and is as follows:

"I have hoped that this license could be cancelled by mutual consent * * *. While I will not waive any rights exercised by this notice, I am not so unreasonable as to be unwilling to arrange for a mutual cancellation provided that this is done within the next ten days. If you are in accord with this suggestion please let me know promptly."

To this notice the defendant Microid Process, Inc., replied by letter, saying, *inter alia*:

"In your notice you invite us to join with you in terminating the license agreement by mutual consent. This proposition is very attractive to us, inasmuch as it justifies us in ceasing to pay money to you for which we are getting no adequate return and in limiting a relationship which, because of your defects of temperament, has been extremely unsatisfactory.

"We have, however, certain commitments to other people involving the entire field of your inventions, which we cannot terminate abruptly without their consent. One of these commitments is to the Charles Hellmuth Printing Ink Corporation, to which commitment you also are a party. Hence, for a short time, we shall hold under advisement your suggestion of cancellation by mutual consent, leaving you free to prosecute your legal remedies, if you think best to do so."

The only "commitments to other people" disclosed by the record were sub-licenses and outstanding options. These by the very terms of the license itself were protected against cancellation of the principal license for adjudication of insolvency or bankruptcy or failure to pay dividends or money in lieu thereof. This Court in the chancery cause so determined. *deStubner* v. *Microid Process, Inc., et al,* 124 W. Va. 591, 21 S. E. 2d 154. Thus Microid Process, Inc., clearly indicated to deStubner on March 14, 1939, that he could have, with its consent, everything to which he was entitled, and which he eventually obtained. On the same day the defendant United Carbon Company, Inc., replied to deStubner's invitation saying, "So far as we know, Microid Process, Inc., has done nothing to justify your attempted cancellation of your license to it and until the validity of the attempted cancellation is put beyond controversy by judicial decree or otherwise, we shall continue to recognize Microid Process, Inc., as our licensor." This position taken by United Carbon Company, Inc., was precisely correct. The

notice given by deStubner did not, and could not, cancel the license. That could only be done by a decree of court, pending which United Carbon Company, Inc., had no power to substitute deStubner for Microid Process, Inc., in its sub-license. United Carbon Company, Inc., therefore, simply stood upon its exact legal rights and offered no obstruction whatever to deStubner in the cancellation of his license to Microid Process, Inc. It thus appears that as early as March 14, 1939, deStubner was offered all that he eventually got by his suit for cancellation.

Nevertheless he proceeded with that suit. By his original bill therein he expressly eliminated from the cancellation sought all sub-licenses; but by an amendment made before the defendants had answered, he struck out this exception and henceforth claimed total cancellation of the license and all sub-licenses. The defendants' answers admitted the insolvency of Microid Process, Inc., but denied all other charges in the notice and bill. Therefore, on the pleadings as they then stood, the plaintiff was entitled to everything which he claimed except the cancellation of the sub-licenses. This degree of relief he refused to accept, although it would not have affected his right to litigate further over the cancellation of sub-licenses, and the relief thus tendered by the answers is all he ever obtained. All delay by the litigation ensuing, after the answers were filed, was occasioned solely by deStubner's attempt to procure cancellation of the sub-licenses. In this he totally failed. He got in the end exactly what these defendants indicated a willingness to give March 14, 1939, and what by their answers they conceded he was entitled to. Neither of these defendants ever withheld from, or refused to yield to, deStubner anything to which he was entitled or ever got. They could not cancel deStubner's license nor thrust a cancellation on him, except by agreement with him. They could only consent to a proper cancellation demanded by him. The defendants never thereafter exercised or attempted to exercise any rights under the license as dis-

tinguished from the sub-license, except those which United Carbon Company, Inc., was adjudged entitled to keep. In no sense did Microid Process, Inc., retain its license from deStubner. The offer contained in the Microid letter of March 14, 1939, was never withdrawn or modified. The plaintiff had only to accept then what he ultimately got. By no conceivable theory of law, equity or justice can the plaintiff be considered as entitled to collect from the defendants, or either of them, any of the sums provided in any of the contracts during this period.

(4) Another aspect of the case is equally potent to defeat the plaintiff's action. By his contract with the defendant Microid Process, Inc., the plaintiff not only licensed his patents to that corporation but was required to act as "director of technical research". He was required to serve as such without salary but with the provision that if the dividends or payments in lieu of dividends did not amount to the sum of $7,500 for the first year and $12,000 for the years thereafter he should be "at liberty to terminate said employment". The dividends or money to be paid in lieu thereof were, therefore, also compensation for his services. These services he was bound to render. His performance under the license agreement was not complete unless he acted as director of technical research. The letter from the defendant Microid Process, Inc., to the plaintiff, dated August 18, 1936, being the date of the Microid Process, Inc., resolution and the date of the execution of the three agreements which bore date July 31, 1936, reads as follows:

"This letter is to evidence our understanding that the sums payable to you as or in lieu of prior dividends on the Class "A" stock of this Corporation, heretofore issued to you as set forth in the written agreement between us dated July 31, 1936, are to be paid to you in equal monthly amounts on or before the last day of each month beginning in August, 1936. The understanding as evidenced by this letter shall not affect or

> modify in any manner the other provisions of said agreement. Should your employment as director of technical research for this Corporation terminate, for any reasons, any dividends payable on the Class "A" stock are to be paid as authorized by our Board of Directors in accordance with said agreement."

This clearly and expressly says that when deStubner shall cease to be director of technical research the monthly payments of $625 shall terminate, and that further payments to him shall be made only in accordance with the agreement between Microid Process, Inc., and deStubner dated July 31, 1936. The plaintiff made. no protest thereto, nor to any statement or condition therein contained. On the contrary he treats this letter as part of the total contract between himself and the defendants. He introduced it in evidence at the trial, relies upon it and is thereby bound by it. It is perfectly clear, therefore, that the monthly payments of $625 could only be claimed by him so long as he acted as director of research. Certainly he did not so act after March 1, 1939. He not only did not act as such, but put himself in a position where it was impossible for him so to do. Unquestionably his "employment as director of technical research" terminated upon his notice for cancellation of his contract. He certainly could claim nothing under the Microid resolution thereafter. If, therefore, any vestige of the plaintiff's right to the monthly payments of $625 mentioned in the resolution of Microid Process, Inc., survived it was wholly eliminated and extinguished by the plaintiff's notice of cancellation and suit pursuant thereto. This result followed the cessation of his employment as director of technical research "for any reason."

I would reverse the judgment of the trial court, enter here a judgment of *nil capiat* against the plaintiff and award to these defendants costs both in this Court and the court below.

Judge Fox directs me to say that he concurs in this note.