**HAMILTON LABORATORIES, Inc., v. MASSENGILL.**

No. 159.

District Court, E. D. Tennessee.

Nov. 8, 1938.

Pennie, Davis, Marvin & Edmonds, of New York City, and D. C. Webb, of Knoxville, Tenn., for plaintiff.

Watson, Bristol, Johnson & Leavenworth, of New York City, and Frank W. DeFriece, of Bristol, Tenn., for defendant.

TAYLOR, District Judge.

The bill charges direct and contributory infringement of United States Patent No. 2,014,676 issued to plaintiff by assignment of Lyle A. Weed, September 17, 1935, based on an application filed November 19, 1934. Plaintiff relies upon claims 5, 7 and 8 as basis for the charges of direct infringement, and upon method claims 1, 3 and 4 for the basis of charges of contributory infringement.

The pertinent claims are:

"1. The method of treating pathogenic germs while they are in contact with tissue of living higher animals for the purpose of rendering the germs innocuous and without harming the animal, which comprises contacting said germs in situ with a solution of suitable concentration of an organic mercury compound having the formula $RHgX$ wherein R represents a phenyl radical carrying no substituent groups which will react with either alkalies or acids to form salts, and wherein X represents an element or radical which exists as an anion when the compound is dissolved in water.

"3. The method of claim 1 wherein said organic mercury compound is a phenyl mercury compound having the formula $C_6H_5HgX$ wherein X is an element or radical which exists as an anion when the compound is dissolved in water.

"4. The method of claim 1 wherein the organic mercury compound is basic phenylmercuric nitrate.

"5. A germicidal preparation for use in suitable concentration in contact with tissue of a living human being or other higher animal for the purpose of combating the attack of pathogenic micro-organisms on said animal, without harming the animal, comprising an organic mercury compound having the formula $RHgX$ wherein R represents a phenyl radical carrying no substituent groups which will react with either alkalies or acids to form salts and wherein X represents an element or radical which exists as an anion when the compound is dissolved in water.

"7. The germicidal preparation of claim 5 wherein said organic mercuric compound is a phenyl mercury compound having the formula $C_6H_5HgX$ wherein X is an element or radical which exists as an anion when the compound is dissolved in water.

"8. The germicidal preparation of claim 5 wherein said organic mercuric compound is basic phenylmercuric nitrate."

At the hearing it was clearly proven, if not conceded, that, assuming the ownership and validity of the patent, both direct and contributory infringement resulted from acts of the defendant.

I have found no difficulty in reaching a conclusion from the evidence that plaintiff acquired from Weed all of his in-

terest in the patent, and there is no evidence of any outstanding interest therein. This leaves for consideration and determination the sole question of validity.

■ Because patents are not issued as matter of course, but after consideration of underlying questions, such as state of the art, as it bears on the question of novelty, discovery, invention and the like, they are themselves prima facie evidence of their validity. It is contended by defendant that this prima facie case is weakened, or that the presumption of validity has not arisen in this case for the reason that the patent issued without a consideration of the prior art, that none was cited, and that, therefore, the basis for the inference of validity does not exist. This contention is not persuasive. It cannot be assumed from any evidence in the record that the patent issued without consideration of these questions. There is no showing of fraudulent misrepresentation as to bactericidal or bacteriostatic power as basis for the issuance of the patent such as would weaken or negative the presumption of validity. I reach the conclusion, therefore, that the patent is prima facie evidence that the subject matter of the patent is novel, and that the requirements of patentability have been met. Doubtless the prima facie evidence would be weaker or more easily overcome if the record disclosed infirmities on the face of the patent office proceedings, but here the proceedings were apparently regular, so that the defense that Weed was not the original, first and sole inventor and discoverer of the alleged germicide and method disclosed in the patent or any material or substantial part thereof, and that the alleged invention of the germicide does not in fact constitute patentable invention, improvement or discovery within the meaning of the patent law and in view of the prior art, as evidenced by disclosures of patents, publications and the common knowledge of those skilled in the art (Article of E. C. White, "Industrial and. Engineering Chemistry," October, 1924, p. 1034, et seq., Monograph by Frank C. Whitmore, 1921, "Organic Compounds of Mercury;" Kharasch Patent 1,589,599; Kharasch Patent 1,770,886; Kharasch Patent 1,770,887; Englemann Patent 1,780,008; Kharasch Patent 1,938,-839; Schepps et al. Patent 1,969,857; French Patent 210,281), are defenses that must be established by the defendant relying upon them, resolving reasonable doubts in favor of validity. Coffin v. Odgen, 18 Wall., U.S., 120, 21 L.Ed. 821; The Barbed Wire Patent, 143 U.S. 275, 12 S.Ct. 443, 450, 36 L.Ed. 154; Adamson v. Gilliland, 242 U.S. 350, 37 S.Ct. 169, 61 L.Ed. 356; Smith v. Goodyear Dental Vulcanite Co., 93 U.S. 486, 23 L.Ed. 952.

Before further discussing the chemical problem, so far as the involved chemistry presents one, it must be understood that the theory that bactericidal efficiency is due, at least in part, to the manner of the ionization of all of the mercurials made under the formulae with the permitted substituent groups, is wholly immaterial. Both the theory of ionization and of electron sharing ability were known to the art when the patent issued. If the patent must stand or fall upon discovery that bactericidal efficiency of the formulae employed came about by the behavior of the ions, it would fall if the pharmacological value of germicidal organic mercurials which ionize as in the formulae here involved was known to the prior art.

The unique feature of the patent is that the germicidal element in the mercury compounds when contacted with body fluid became available as a less soluble and less toxic precipitate for further bactericidal effect as the precipitate slowly dissolves, and that, under the theory of ionization, it operated to adsorb the positively charged mercurials on the negatively charged pathogenic organisms. No such claim of behavior can be found for any similar product used, nor was such behavior disclosed prior to this patent in connection with products having a bactericidal or bacteriostatic effect when used on plant organisms, and the same may be said as to similar agencies destructive of fungi, mould or other microscopic vegetable life. In this type of patent and disclosure, the claimed effect of the mercury resulted from its contact with the organisms themselves without the intervention of any diluent, chemical reaction or change by contacting the host's chemical composition.

■ If a known chemical combination produces a known result, the discovery of the law controlling the intervening operative steps is not invention or patentable discovery. Such controlling law of operation could not be patented. No patents or publications made disclosure of this precise behavior of mercurials in the presence of body fluids.

An understanding of the chemistry of the patent is only important and essential

to a decision as it aids in an appreciation of the state of the art when the patent issued, and whether the patented method or use was known to the art.

The defendant claims the article written by E. C. White and published in "Industrial and Engineering Chemistry" in October, 1924, is a full disclosure of all that was patentable in the case at bar. The article invalidates the patent in suit if in it can be found an answer to the problem confronting Weed in his search for organic mercurials sufficiently germicidal to be pharmacologically useful and at the same time innocuous to man. White in his article referred to a formula included within the Weed patent claims, (RHgX), mentioned substituent groups, eliminated some as pharmacologically useless, and said that the organic mercurials represented by the stated formulae and those mentioned having like substituent groups were merely typical and in no sense to be taken as an indication of the number of possible groups or concatenations which he said included the whole gamut of aromatic chemistry. White's article, in so far as pertinent to the present inquiry, disclosed: "Numberless combinations of mercury with organic substances have been made. They range from simple mercury salts of organic acids through the so-called complex salts of mercury with basic substances, to the true organic mercury compounds. The last class, which is the one that has shown most interest from the therapeutic standpoint, includes only those compounds in which a mercury atom is bound by one or both bonds directly to carbon. For the purposes of this discussion we may eliminate the aliphatic substances of this class, none of which has given promise of therapeutic usefulness, and confine ourselves to the aromatic group. Our compounds are, then, of two groups, the singly bound and doubly bound types:

$$RHgX \qquad RHgR$$
$$I \qquad\qquad II$$

in which R represents a benzene ring with or without substituent groups, and X represents a group such as $OOCCH_3$, OH, a halogen, CN, CNS, or the thiosulfate group. Experience has shown that compounds of Type II are relatively inert both in toxicity and in bactericidal action. (An exception appears in the work of De Witt, who found that certain doubly bound mercurials had marked effect on the tubercle vacillus in vitro). Our consideration then narrows down to substances of the first group. This is a limitation of type but not of number, for when we consider that in the group R we may substitute single groups or concatenations of any complexity we see that the whole gamut of aromatic chemistry may be run in the synthesis of mercurials for pharmacological study."

Of course White used the word "pharmacological" to denote the field in which only tolerably toxic agents could be safely employed. He stated a formula, and pointed out the whole field in which organic mercury might or might not produce compounds of such tolerable toxicity. He told those interested in the art, in effect, to take his formulae and try the various combinations within the permitted substituent groups, of which he gave a typical illustration, and that the whole story of pharmacological mercurials would unfold. The claims of the patent in suit cover every group to which he opened the door already ajar, if in the presence of acids or alkalies the substituents would not form salts.

Basic phenylmercuric nitrate was known to the art as early as 1870, though by name it was phenylmercuric nitrate until the fact that it was basic was discovered by analysis made at the instance of Mr. Bradner, now an officer of the plaintiff.

Testing for purity by crystalization and various methods of purification, were well known to the art long before Weed. Whether Otto had thiophene-free benzene does not clearly appear from the record, nor is it clear that the presence of thiophene would affect the product from a pharmacological standpoint. Whether phenylmercuric nitrate made from benzene containing thiophene would be more or less bacteridical or more or less toxic does not appear, and is perhaps of but little importance.

The method claims, the application statements and the use claims are all so permeated with the theory of ionization and the related, if not identical, theory of electron sharing ability that they mask the simple proposition that long prior to Weed's thesis the pharmacological value of organic mercurials was known to the art, and that its toxicity was decreased when in such combinations. In my opinion the thesis was not published by placing it in the college library. Berlinger v. Busch Jewelry Co., 2 Cir., 48 F.2d 812, 813, is not contra, it evidently being apparent and assumed that the catalogue design referred to had

468

at the time of its use (1905) been generally circulated. A catalogue would otherwise be useless.

The distinction I see between Weed's discovery or claim and that of the disclosure in White's article is that Weed attributes the germicidal power, at least in part, to the theory that positively charged mercury bearing ions of his formulae, including permitted substituent groups upon contact with body fluids, were adsorbed onto the negatively charged pathogenic organisms. That theory, while interesting, cannot save the patent, if it was known to the art that organic mercury in combination with various groups of characteristic behavior retained its germicidal power and was less toxic to human beings than when used alone. I think that this was known to the art prior to Weed. Toxicity at best is a matter of degree. The use of the compounds here involved is still more or less experimental, but they are of undoubted value, and like mercurials have been the subject of every method of use claimed in the patent before Weed.

As I view the facts, in the light of the prior art cited and disclosed in the record, I am of opinion the patent and its various claims here involved are invalid for want of patentable invention or discovery; that the prima facie evidence has been overcome.

The action will be dismissed.