## DE STUBNER v. UNITED CARBON CO. et al.

### No. 5611.

Circuit Court of Appeals, Fourth Circuit.

Sept. 25, 1947.

Staige Davis and Sam L. MacCorkle, both of Charleston, W. Va. (Ben O. Shepherd, of Detroit, Mich., and Davis & Painter, of Charleston, W. Va., on the brief), for appellant.

A. G. Stone, of Charleston, W. Va. (Donald O. Blagg and Rummel, Blagg & Stone, all of Charleston, W. Va., on the brief), for appellees.

Before PARKER and SOPER, Circuit Judges, and CHESNUT, District Judge.

SOPER, Circuit Judge.

This is a suit in equity wherein Emile C. deStubner seeks an accounting and a judgment against the defendants in the approximate sum of $2,025,000 for royalties alleged to be due him for the use of certain patents, inventions and discoveries relating both to processes for the manufacture of so-called dustless carbon black and also to the art and science of pigment dispersion. The suit involves also the claim that certain patents for processes for the manufacture of dustless carbon black, issued to employees of the defendants and assigned to one of the defendants, are his intellectual property and should be assigned to him under his prayer for general relief.

United Carbon Company, hereinafter called United, is a Delaware corporation engaged in the production, transportation and sale of natural gas and oil. It also holds large amounts of stock in various corporations. One of these is United Carbon Company, Inc. (Maryland), hereinafter called United, Inc., which is a Maryland corporation and a wholly-owned subsidiary of United. United, Inc., was established in April of 1935 and at that time United transferred to it all its carbon black interests. These interests include the production of dustless carbon black as well as the production of carbon black pigment dispersions. While the plaintiff's relationship with the defendants was originally initiated by an agreement between him and United in 1934, United, Inc. was substituted for United in 1935, and thereafter the plaintiff has dealt with United, Inc., rather than with United. The plaintiff seeks to impose liability on both United and United, Inc., on the theory that they jointly conspired to defraud him and that the distinct corporate entities should, as a consequence, be disregarded. United denies liability to the plaintiff in toto. United, Inc., denies that it is liable to the plaintiff for royalties in connection with any processes employed by it for the production of dustless carbon black, or that any of the patents therein of which it is the assignee are the plaintiff's intellectual property, or that it is liable to the plaintiff for monthly salary or so-called minimum royalties hereinafter men-

tioned. United, Inc., admits that it owes the plaintiff royalties for the use of his patents, inventions and processes relating to the art of pigment dispersion, but asserts that this liability is more than offset by certain expenditures properly made by it under the contracts between the parties.

The District Court found that the plaintiff had not disclosed to the defendants any inventions or discoveries which enabled the defendants to develop the processes used by them in the production of dustless carbon black, and hence the plaintiff was not entitled to an assignment of the patents relating to the production of carbon black which were controlled by the defendants, and that the defendants were not liable to the plaintiff for royalties in connection therewith. The court also found that the defendants were not liable to the plaintiff for monthly salary or minimum royalties. The court, however, appointed a master to determine the liability, if any, of United Inc., to the plaintiff for royalties on the patents and inventions relating to the art of pigment dispersion, but subsequently rescinded the order of reference when it became clear that the plaintiff was unable to give security for the costs. of the reference. The plaintiff appealed from the final decree of the court in forma pauperis.

The plaintiff has been in this country since 1915 and has practiced his profession as a consultant in New York and has been associated with several corporations in a scientific capacity. In January, 1934, as the result of certain negotiations, he went to Charleston, West Virginia, and met Oscar Nelson, the president, and other officers and employees of United. In May, 1934, he entered into an option agreement with United for the period of one year, which recited that he was the inventor, patentee and sole owner of a number of patents and applications for patents relating to apparatus, processes and products pertaining to the art of pigment dispersion, and that United was desirous of obtaining an option to secure an exclusive license to exploit such inventions. The agreement further provided that, in the event United determined to exercise its option, a separate corporation would be established under the laws of West Virginia to act as a

holding company for the patents and applications covered by the option. The plaintiff agreed to demonstrate to United his inventions, and United agreed to provide the facilities for such demonstrations, and to pay the plaintiff $150 per week during the period of such demonstrations. Pursuant to this agreement, United provided the plaintiff with a laboratory in Charleston in the summer of 1934, and the plaintiff continued his research work and, on occasion, demonstrated his processes to officers and employees of United.

In April, 1935, United, Inc., was incorporated and with the plaintiff's consent was substituted for United as a party to the option agreement. This agreement was extended several times and finally, as contemplated therein, Microid Process, Inc., hereinafter called Microid, was established under the laws of West Virginia. On August 18, 1936, three contracts were executed, all bearing the date of July 31, 1936, to wit: (a) an agreement between the plaintiff and United, Inc.; (b) an agreement between the plaintiff and Microid, and (c) an agreement between Microid and United, Inc. They may be summarized as follows:

*(a) The agreement between the plaintiff and United, Inc.* This contract opened with a recital that United, Inc., had decided to exercise its option, and that pursuant thereto the plaintiff and United, Inc., had caused the incorporation of Microid, with 9000 shares of no-par value common stock, divided into 3000 shares of class "A" common stock, and 6000 shares of class "B" common stock. The class "A" stock was issued in its entirety to the plaintiff, and all the class "B" stock was issued to United, Inc. The class "A" stock was to be preferred over the class "B" stock in that no dividends could be declared on the class "B" stock during any fiscal year unless during the same year dividends amounting to $12,000 had been declared or paid to holders of class "A" stock, except that during the first year of the agreement (August 1, 1936 to July 31, 1937) the class "A" stock was to be preferred over the class "B" stock only to the extent of $7,500. United, Inc., was to assign to Microid its 70 per cent. stock interest in a Delaware corpora-

tion, the Colloidal Pigment Company, and contemporaneously therewith Microid was to execute a license granting the said company a non-exclusive right to manufacture, use and sell aqueous dispersions of carbon black for use in coloring concrete, mortar and paper. The agreement also contained the following clause which is of some importance in connection with the plaintiff's claim for so-called minimum royalties: "Should Microid not have funds available for the purpose, United, so long as it retains the right to use a license, bearing even date herewith granted by Microid to United, shall advance the funds necessary to pay taxes, * * * and such expenses as Microid shall have incurred by order of its board of directors."

*(b) The agreement between the plaintiff and Microid.* Under this contract the plaintiff granted to Microid the exclusive and non-assignable license to use together with the sole right to sub-license the use of, the following: (1) The inventions, improvements or discoveries disclosed in the patents and patent applications set forth in a schedule attached to the agreement; (2) all patents and patent applications of the plaintiff in any foreign country; and (3) "all inventions, discoveries or improvements relating to any idea, machine, apparatus, formula, fact or process pertinent or valuable to the *science and art of pigment dispersions* of whatever kind and nature heretofore or hereafter made, discovered, compiled or developed by de-Stubner or with respect to which he has a right to grant a license." (emphasis supplied.) The plaintiff also agreed to serve as director of technical research of Microid for a period of five years without compensation. Microid, in turn, issued to the plaintiff its 3000 shares of class "A" common stock. The contract further provided that the plaintiff could cancel the contract if (1) Microid was adjudged insolvent, or (2) if the dividends declared on class "A" stock during any fiscal year did not amount to $12,000, unless some third party, presumably United, Inc., paid to the holders of class "A" stock the difference between the dividends actually received and $12,000 (except that during the first year the license could only be cancelled if the div-

idends on class "A" stock were below $7,500). It was expressly provided, however, that should the plaintiff cancel the license agreement between him and Microid, all sub-licenses granted by Microid would remain valid and that the plaintiff would merely be substituted for Microid as a sub-licensor and would be entitled to the payment of royalties under the sub-licenses.

Attached to this agreement was a schedule of the plaintiff's patents, applications and inventions. This schedule was divided into three headings: (a) Issued United States Letters Patent; (b) pending United States Patent Applications; and (c) docketed but not filed. The last heading related to twenty-nine inventions of the plaintiff, not covered by patent applications, but disclosed to his patent attorney and identified by docket numbers in the attorney's office. This list included docket No. E926 which related to the discovery of a process for the manufacture of dustless carbon black. The majority of the remaining patents and inventions, listed in the three schedules, were concerned with processes for pigment dispersion, and no invention, except that described in E926, dealt with the production of dustless carbon black.

*(c) The agreement between Microid and United, Inc.* By this agreement Microid granted to United, Inc., a license to use and to sub-license to others to use all the inventions and discoveries controlled by Microid, whether patented or unpatented, relating to the treatment of carbon black and other pigments, including the patents and inventions set forth in an annexed schedule of patents, applications and inventions which, except for immaterial omissions, were identical with those listed in the schedule annexed to the agreement between the plaintiff and Microid. United, Inc., agreed to disclose and assign to Microid, at its request, all inventions, processes, formulas or discoveries made, acquired or used by United, Inc., relating to or useful in the exercise of the license granted by Microid to it, and also promised to pay Microid reasonable royalties for the use of the processes and inventions granted it. The agreement provided that if the parties were unable to agree as to the reasonable rate

of royalties, the dispute would be referred to an arbiter who was to determine the rate of royalties deeemed reasonable, and was then to award one-half thereof to Microid. In case the plaintiff cancelled the agreement between him and Microid, and thereby became substituted for Microid as the licensor with respect to United, Inc., the royalties payable to Microid should be reduced by two-thirds and the remaining one-third was to be payable to the plaintiff. It was also provided that money advanced to or for the account of Microid by United, Inc., could be credited by United, Inc., against royalties then or thereafter due to Microid. United, Inc., reserved the right to cancel the sub-license agreement by giving notice at any time, such cancellation to become effective on the first day of August immediately following the giving of such notice. The plaintiff signed this agreement to indicate his approval of its terms.

1. The Plaintiff's Claim for Royalties for Defendants' Production of Dustless Carbon Black.

The most important issue in this case, which was resolved against the plaintiff by the District Judge, is whether these agreements were restricted to inventions and processes pertinent to the art of pigment dispersion, or whether, as urged by the plaintiff, they were intended to cover and did cover discoveries and processes for the production of dustless carbon black. It is therefore necessary at the outset to distinguish between these substances and the problems encountered in their production. Carbon black consists of the soot produced by burning natural gas in an insufficient quantity of oxygen. In its raw state carbon black is a flocculent powder of considerable bulk and of very low density. While it is being cooled immediately following its production, it adsorbs natural atmospheric gases to such an extent that it sometimes occupies only 5 per cent. of its own apparent volume, the rest consisting of adsorbed gases and also of gases which are free to move between the particles (occluded gases). As a result, raw carbon black is extremely dusty and highly responsive to the slightest current of air.

Around 1915 it was discovered that carbon black is an excellent reinforcing agent for rubber in the manufacture of tires inasmuch as it increases the cohesion and durability of tires and of rubber products in general. However, the dustiness of carbon black engendered many problems with respect to its handling and transportation, and also occasioned considerable discomfort to those who worked with it. With the passage of time many processes have been developed which seek to render carbon black dustless. These processes will be discussed in greater detail at a later stage of this opinion. For the present it will suffice to say that the term, dustless carbon black, as it is understood in the industry, refers to small and virtually pure pellets or aggregates of carbon black particles which are substantially dustless, but which at the same time are sufficiently friable to permit their ready dispersibility in rubber. These three characteristics of the end product, i.e. dustlessness, purity and dispersibility, are essential to the commercial success of any process devoted to the manufacture of dustless carbon black.

The art of pigment dispersion relates, as the name clearly indicates, to processes for dispersing pigments. Pigments are minute particles of solids which are used as coloring agents in paints, inks, lacquers, varnishes, and similar products. The goal of a process for pigment dispersion is to disperse as finely as possible selected pigments in an appropriate dispersion medium. In order to prevent the dispersed particles from agglomerating with one another after they have been divided in this medium, a dispersion agent is always used to stabilize the dispersion. While carbon black may be dispersed as a pigment and used as a coloring agent, the art of pigment dispersion is obviously by no means limited to the utilization of carbon black pigments.

It will be noted that while the end product of a process adapted to the production of dustless carbon black is, and must be, a solid, the ultimate product of a process for pigment dispersion is normally a liquid or solvent. Processes for pigment dispersion have as their goal the fine dispersion and stabilization of minute particles in a dispersion medium. Far from producing

pellets or aggregates, the purpose is to divide as finely as possible the pigments and to prevent them from subsequently forming aggregates. Manufacturers of dustless carbon black, on the other hand, seek to produce pellets of substantially pure carbon black. In fact, carbon black when originally produced is a sogasoid, i.e., a system wherein carbon black particles are suspended in a gaseous state. We might compare this sogasoid to a dispersion in that the carbon black is in a sense dispersed in natural gases. But it is precisely these gases in which the carbon black is suspended which cause its dustiness, and therefore processes for rendering carbon black dustless aim at the removal of these gases and, consequently, at a *destruction* of the original dispersion. Of course it is essential that dustless carbon black pellets be readily dispersible since it is intended that they ultimately be dispersed in rubber, though the dispersion of carbon black in rubber differs somewhat from the pigment dispersion processes we have described in that the rubber in which the carbon black is dispersed acts as its own dispersing agent, "locking" the carbon black pellets after they have been divided in it. But the point is that carbon black in its raw state is very dispersible and devices whereby it is made substantially dustless merely seek to *preserve* rather than to create this dispersibility. Basically, this preservation is achieved by producing pure carbon black pellets and eliminating, insofar as it is possible, all other elements.

The plaintiff's position is that the contracts between him and the United corporations, as well as his researches in the Charleston laboratory, and his disclosures to the defendants, related not only to the art of pigment dispersion but also, if not primarily, to the production of dustless carbon black. He testified that Nelson was eager to secure a practicable process for the manufacture of dustless carbon black that could be used commercially without infringing existing patents, and that between July 16 and August 7, 1934, he disclosed such a process to Nelson. This process consisted in mixing carbon black and water in approximately equal quantities to form a plastic mass which was then extruded through a meat grinding machine to form spaghetti-like cylinders which were then treated in a drying machine and cut into small pellets of dustless carbon black. This testimony was denied in toto by Nelson and other employees of the defendants and their testimony prevailed in the District Court in connection with certain supporting facts found by the Judge.

It was clearly shown, for example, that no meat grinder was brought to the laboratory before the end of September, 1934, and even more convincingly that in the numerous letters and documents in evidence concerning the plaintiff's investigations and experiments, there was no reference to any process for making dustless carbon black. In explanation of this significant omission the plaintiff testified that Nelson enjoined him to keep secret the true nature of his investigations and to make it appear to the whole world, including defendants' officers and employees, that the plaintiff's investigations related only to pigment dispersions. This explanation, however, was found by the District Court to be incredible, but in any event the "veil of secrecy" was confessedly lifted on May 25, 1935, and thereafter no longer served even as an excuse to explain the absence of documentary data in this important field.

In addition, as late as November, 1938, the plaintiff was making accusations in a letter to Nelson that Microid and United, Inc., had adopted a "do-nothing" policy with respect to the plaintiff's inventions and processes covered by the license agreements of August 18, 1936; and in March, 1939, the plaintiff instituted proceedings in the courts of West Virginia to cancel the licenses on the ground that both Microid and United, Inc., had failed to exploit his patents and inventions. See De Stubner v. Microid Process, Inc., 121 W.Va. 773, 6 S. E.2d 777; Id., 124 W.Va. 591, 21 S.E.2d 154. If the license agreements had in fact covered processes for the production of dustless carbon black, the plaintiff, whatever his grievances might have been, could scarcely have complained of a "do-nothing" policy on the part of Microid and United, Inc., inasmuch as United, Inc., had rapidly expanded since 1935 and was becoming one of the major producers of dustless black in the United States; and yet the plaintiff

made no claim to a share of the profits earned in the manufacture of dustless carbon black until August, 1942, more than three years after he sued the defendants in West Virginia courts. Furthermore, the plaintiff was frequently visited in the laboratory by other employees of United and of United, Inc., who were well versed in the field of science, and it is incredible that Nelson and the plaintiff could seriously have contemplated that these experienced men could be led to be believe that the plaintiff was working on pigment dispersion whereas in point of fact he was working on dustless carbon black.

It is also of great significance that the license agreements of August 18, 1936, make no reference to dustless carbon black, despite the fact that more than a year had elapsed since the "veil of secrecy" had been lifted. The option agreement of May 1, 1934, was expressly limited to pigment dispersion, and the agreement of August 18, 1936, between the plaintiff and United, Inc., wherein the option was exercised, contains no suggestion that the field of investigation was to be extended so as to include the considerably more important subject of dustless blacks. The license from the plaintiff to Microid expressly states that it covers all inventions, discoveries or improvements "pertinent or valuable to the science and art of pigment dispersions * * *." The provision as to future patents, inventions, or discoveries of the plaintiff in § 3(c) of that contract is likewise limited to the science and art of pigment dispersion. It is inconceivable that United, Inc., would have omitted all mention of the field of dustless black in § 3(c) if it had been its intention that carbon black aggregates were to be covered by the license. The sub-license agreement between Microid and United, Inc., states that it covers inventions, etc. "for the treatment of carbon black or other pigments produced by the combustion or decomposition of hydrocarbon gases, petroleum or petroleum products and lamp black" and is necessarily limited to the field covered by the master license from the plaintiff to Microid.

The plaintiff advances the contention, however, that the inclusion of invention E926, relating to a process for the manufacture of dustless carbon black, in the schedule attached to the license from him to Microid, and also to the sub-license from Microid to United, Inc., demonstrates that it was the intention of the parties that dustless blacks were to be included within the coverage of the license agreements. The invention disclosed in E926 proposes to produce dustless carbon black by passing raw carbon black through centrifuges. It has never become the subject matter of a patent or, insofar as we are able to determine, of an application for a patent. The defendants have never used the process set out in E926 and it is not even claimed that the process suggested to them any of the patented processes by which they now manufacture dustless blacks. In fact, it does not appear that any company in the field uses commercially any process similar to that revealed in E926.

E926 was disclosed on July 30, 1936, by the plaintiff to his then patent attorney, who drew up the schedule attached to the license and sub-license agreements. He testified that he had been uncertain as to whether to include E926 in the schedule, but finally decided to do so, reasoning that if it were not related to pigment dispersion it would be excluded by the very terms of the license agreement. The defendants offered testimony that they were not aware of the inclusion of E926 until years after the execution of the license agreements. Since the license agreements were restricted by their terms to the art of pigment dispersion, and the conduct of the parties was similarly confined, we are of the opinion that the mere inclusion of E926 in a schedule of nine patents, ten applications and twenty-nine inventions is not sufficient to tip the scales in the plaintiff's favor and establish that the parties to the contracts of August 18, 1936, intended to include processes for the production of dustless black. In the light of all the above facts, it is manifest that there was no error in the finding of the court below that the agreements of August 18, 1936, were not intended to and did not cover the field of dustless carbon black.

The plaintiff makes the additional contention that even though his disclosures

related to the art of pigment dispersion, they nevertheless revealed processes which the defendants have seized upon and incorporated as essential parts of the processes for the manufacture of dustless carbon black described in the patents taken out on their behalf. He argues that these latter processes fall within the scope of the contracts because the parties entered into a joint enterprise and confidential relationship for the commercial development of the plaintiff's patents, and therefore the plaintiff is entitled to royalties on the dustless carbon black manufactured by the defendants under their patents in the same manner as if the goods had been produced in the course of pigment dispersion.

The legal basis of this argument is not clearly defined since, as we have seen, the agreements by their very terms related to developments in the field of pigment dispersion and not of dustless carbon black. The decision of this court in Saco-Lowell Shops v. Reynolds, 4 Cir., 141 F.2d 587, is therefore not controlling. But if we assume that the agreements may be so liberally construed as to make the defendants liable for any developments in the field of dustless carbon black fairly attributable to the plaintiff's discoveries, the facts before us fail to trace the connection but show, on the contrary, as the District Court found, that the defendants' patents were developed independently of the plaintiff's laboratory researches or prior disclosures.

The desirability of producing carbon black in dustless form as an ingredient in manufacturing processes has long been recognized, and various methods of accomplishing this purpose are disclosed in the issued patents. Wiegand and Venuto, in their patent No. 1,889,429, applied for December 2, 1927, and issued November 29, 1932, directed that carbon black be mixed with water so as to displace the occluded gases and form a thin paste. The mixture was then agitated with gasoline whereupon the carbon black floated to the top in small pellets which were screened off and dried. This patent has been in litigation in this and other courts. See Binney & Smith Co. v. United Carbon Co., D.C.S.D. W.Va., 37 F.Supp. 779; Id., 4 Cir., 125 F.2d 255; Id., 317 U.S. 228, 63 S.Ct. 165, 87 L.Ed.

232; United Carbon Co. v. Carbon Black Research Foundation, D.C.Md., 59 F.Supp. 384.

Glaxner, in his patent No. 2,065,371, applied for November 6, 1933, and issued December 22, 1936, Reissue No. 21,379, March 5, 1940, eliminated the use of gasoline and provided for the mixing of water and carbon black in approximately equal quantities to form a pasty mass and subjecting it to agitation.

The idea of mixing carbon black and water so as to form a plastic mass was not new with these inventors. Thus the Lewis patent, No. 1,263,082, applied for January 25, 1917, and issued April 16, 1918, disclosed a process for the manufacture of dustless carbon black by mixing carbon black and water. Lewis stated that the preferred proportions of liquid and solid were such as to form a paste or wet plastic mass.

Distinguished from these methods are the dry processes of Cabot and Huber which consisted in the main of mixing raw carbon black with black which had already been treated to form granules and subjecting the entire mixture to agitation. See Godfrey L. Cabot, Inc., v. J. M. Huber Corp., 5 Cir., 127 F.2d 805.

The defendants' patents, which plaintiff contends were derived from his disclosures and should be subjected to his claim for royalties as to past operations, and assigned to him as his own property, are five in number. They are: Teegerstrom No. 2,213,059, applied for April 29, 1938, and issued August 27, 1940; Hanson and Skoog No. 2,283,364, applied for April 29, 1938, and issued May 19, 1942; Skoog and Bradford No. 2,213,056, applied for April 29, 1938, and issued August 27, 1940; Hanson and Skoog No. 2,288,087, applied for July 29, 1940, and issued June 30, 1942; Grote No. 2,040,770, applied for August 22, 1933, and issued May 12, 1936, Reissue No. 21,390, applied for September 27, 1937, issued March 12, 1940.

The first two patents and the last patent in this list are for processes, and the third and fourth for apparatus for the formation of dustless carbon black. We shall address ourselves primarily to the Teegerstrom pat-

ent, since this is the most important of the group and the one which includes the several steps which the plaintiff contends were appropriated from his disclosures. Teegerstrom proposed to eliminate the adsorbed and occluded gases from the carbon black by mixing it with an approximately equal quantity of water by weight and then forcing the paste so formed through a conventional pellet mill equipped with a perforated disk or plate. The substance emerges from the mill in columnar form which breaks off of its own account to form columnar pellets with jagged edges. These are then dried by subjecting them to the passage of hot air in a drying chamber.

The plaintiff contends that four patents and one patent application filed by him supplied all the essential parts of the defendants' processes and particularly those disclosed in the Teegerstrom patent. The plaintiff's patents are: No. 1,866,017, applied for September 23, 1926, and issued July 5, 1932; No. 1,955,738, applied for January 18, 1929, and issued April 24, 1934; No. 1,965,764, applied for February 1, 1932, and issued July 10, 1934; No. 2,086,977, applied for June 9, 1934, and issued July 13, 1937. The application, No. 757,469, was filed December 14, 1934.

All of these patents relate in terms to pigments and processes for dispersing the same. The application discloses a dispersion method and device which utilizes pressure. Much of the material in these documents is irrelevant to the present inquiry and accordingly, we confine ourselves to a summary of the disclosures therein which the plaintiff says enabled the defendants to develop their process and to obtain patents for the production of dustless carbon black. The plaintiff avers that he disclosed to the defendants (1) the scientific fact that carbon black and water should be mixed together in equal proportions so as to form a paste or plastic mass from which pellets may be formed; (2) the extrusion process; and (3) the proper method for drying or dehydrating the pellets produced from the original mixture of carbon black and water.

In the opinion of the District Judge, with which we agree, none of these claims can be allowed. It cannot be gainsaid that

water when mixed with carbon black eliminates the gases which are the principal cause of its dustiness; but it is equally undeniable that this fact has been known for years, and the plaintiff insofar as he discloses the fact in his patents, can lay no claim to novelty. The plaintiff, however, argues that he discovered and disclosed the proper proportions in which carbon black and water should be mixed. Nowhere in his patents does he categorically state that carbon black should be mixed with an equal amount of water, but he relies on certain intercompany correspondence made during his investigations wherein it is stated that in the preparation of a carbon black water pulp for use in coloring paper, equal parts of carbon black and water should be used at the start. It is not clear that such a disclosure in this setting would be relevant to the manufacture of dustless pellets, but in any event it is lacking in novelty because Glaxner in his patent, issued before the Teegerstrom application was filed, showed that in the manufacture of dustless carbon black approximately equal quantities of water and carbon black should be used.

■■ Faced with this fact, the plaintiff takes the position that he was the first to disclose the scientific basis for this formula; but even if this be true it is immaterial for it is well established, on the one hand, that it is not necessary that a patentee understand the scientific basis for his invention, Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U.S. 428, 435, 436, 31 S.Ct. 444, 55 L.Ed. 527; Katz v. Horni Signal Mfg. Corp., 2 Cir., 145 F.2d 961, and, on the other, that the explanation of the laws controlling the operative steps of a process does not constitute invention. Hamilton Laboratories v. Massengill, D.C.E.D. Tenn., 25 F.Supp. 464, Id., 6 Cir., 111 F.2d 584; Luten v. Whittier, 6 Cir., 251 F. 590; Application of Moore, 1945, 147 F.2d 1018, 32 C.C.P.A., Patents, 916.

Nor are we able to perceive that the plaintiff disclosed to the defendants the proper means of drying or dehydrating the pellets. The dehydrating processes disclosed in the plaintiff's patents all involve the substitution of a displacing or dehydrating agent, such as oil or alcohol, for the water, so as to remove the water but retain

744

the dispersion of the pigments in the dehydrating agent. Such processes, however, are of no value in the production of dustless carbon black since it is essential in that operation that the pellets remain pure and without the presence of a foreign element or binder which the rubber industry has found to be undesirable. The defendants indeed claim no novelty for the particular drying methods employed by them in the heating of the moist extruded pellets which was obviously necessary to put them in a finished state. Teegerstrom, for example, dries the pellets by subjecting them to the passage of heated air under pressure.

Probably the most important claim advanced by the plaintiff is that his patent application No. 757,469, filed on December 19, 1934, disclosed the extrusion process covered by the Teegerstrom patent. Indeed his contention in the last analysis seems to be confined to this particular element in the defendants' processes. He testified in reply to an inquiry of the court during the course of the examination that there was nothing new in his basic underlying inventions in regard to the making of dustless carbon black except the extrusion process, but that he was the first one to point out and explain the underlying law of physics. The patent application last mentioned was rejected by the Patent Office, but it should nevertheless be considered in this connection because the license agreements of August 18, 1936, covered inventions whether patented or not. The application disclosed a method of and an apparatus for effecting a substantially homogenous mixture or dispersion of relatively immiscible substances, such as finely divided solids and a dispersion medium, by the use of an apparatus referred to by the plaintiff as a piezo homodisperser. This was to be a rigid but porous body, like a sponge which had been deprived of its elastic properties. The process disclosed consists of forcing the substances to be mixed through the pores or interstices of the piezo homodisperser by the application of pressure. When a solid and a dispersion medium were forced through this apparatus it was calculated that the homodisperser, because of its rigid nature, would have a shearing effect on the solid, dividing

it into fine particles evenly dispersed in the dispersion medium. As an example of the rigid, porous mass which could be utilized as a homodisperser, the plaintiff cited steel wool, and also artificial porous stone.

The plaintiff asserts that inasmuch as one of the purposes of this homodisperser is to deform yielding aggregates by the shearing action adverted to above, it is indistinguishable in principle from the extrusion process covered by the Teegerstrom patent where the wet carbon black paste is forced through the apertures in the die to form columnar pellets. We believe the processes are clearly distinguishable, and to prove the point we need merely quote from the plaintiff's language in this very application as follows:

"The process of my present invention and the mechanical device and apparatus for use therewith bears a superficial resemblance also to known extrusion and molding methods. The resemblance is, however, only superficial and one only needs to compare the resultants to see at a glance the distinctions. The object of my invention is at all times to bring about 'alteration of form' or as the very 'deform' is defined in Webster's dictionary 'to change the shape of (a body) by the action of forces or stresses which exceed the elastic limit and cause permanent strain or rupture,' 'to become disfigured; lose its original form.' Extrusion, however, seeks 'to shape or form' a given substance. I may well define the distinction between extrusion and molding processes and the method of my invention thus: the resultants of the former are usually three dimensional microscopic bodies of well defined, pre-designed accurate shapes and forms which at no time ever show or can be linked with the phenomenon termed in the Brownian motion or Brownian movement. This is in contradistinction to state of matter after processing in accordance with the present invention wherein the microscopic structure of the particles in their dispersed phase shows them to be in continuous zigzag motion."

In addition the defendants offered testimony believed by the District Court, and which we see no reason to disbelieve, which explains very clearly the development of

the Teegerstrom extrusion process. The pellet mill employed therein is covered by the patent to Edgar T. Meakin, No. 1,954,086, issued April 10, 1934. Originally the Meakin pellet mill was designed to pelletize poultry feed. In 1934 the Texas Carbon Industries, in conjunction with the California Press Manufacturing Company, of which Meakin is president, initiated experiments to adapt the pellet mill to the production of dustless carbon black. In December of 1934 United purchased all the assets of Texas Carbon Industries. The experiments with the pellet mill were continued at another plant in Sanford, Texas, until ultimately the Teegerstrom process was perfected and a patent applied for and granted. Teegerstrom was originally an employee of the Texas Carbon Industries and continued as an employee of United after the latter purchased the stock of the Texas Carbon Industries. All these experiments were conducted first in Sayre, Oklahoma, and then in Sanford, Texas. The plaintiff at no time had any connection with either of these plants.

■ Virtually the only piece of circumstantial evidence supporting the plaintiff's position and testimony is the fact that a meat grinder was installed in the Charleston laboratory in September, 1934, and was used by him in the grinding and extrusion of mixtures which included carbon black and water. The plaintiff testified that some time between July 16 and August 7, 1934, Nelson visited the laboratory and was shown by the plaintiff how carbon black and water could be mixed in equal proportions, extruded through apertures in the plate of a meat grinder in cylindrical form, dried in a dryer prepared for the purpose, and broken into short lengths to form dustless carbon black. But there was no corroborating testimony; on the contrary, Nelson and employees of the defendants who frequented the laboratory all testified that the plaintiff at no time made any demonstration to them of a process for the formation of dustless carbon black pellets and experts offered by the defendants testified that a meat grinder could not be profitably employed to produce such pellets. Under these circumstances the finding of

the Judge in favor of the defendants on the point was fully justified. The plaintiff's contention that the other patents of the defendants were derived from him is even less convincing and need not be discussed in detail in this opinion. We conclude that the plaintiff did not disclose to the defendants the processes covered by their patents, and that he is not entitled to an assignment of the patents or to royalties upon the defendants' use of the processes therein described.

■ The plaintiff seeks to buttress his case by the charge that the attorney who represented him in the execution of the agreements in 1936 later betrayed him and disclosed information to the defendants secured from the plaintiff which enabled them to secure the patents on dustless carbon black which they now control. We find no support for the charge in the evidence. It is true that the attorney represented the plaintiff in the execution of the agreements and that in 1935 he described to the defendants the plaintiff's patents, applications and discoveries in an extended report, and subsequently he served the plaintiff in certain other ways to March, 1939, including the preparation and prosecution for him of applications for patents on pigment dispersions, and attempts to further the commercial exploitation of his inventions; and it is also true that in 1937 the attorney accepted employment from the defendants and prepared for them the applications for the patents on processes and apparatus for the manufacture of dustless carbon black. But we do not find that the attorney disclosed to the defendants information regarding said processes and apparatus which had been entrusted to him in confidence by the plaintiff. On the contrary, the proof convinces us, as we have shown, that the plaintiff was working in the laboratory in the field of pigment dispersion and was not in possession of information which enabled the defendants to secure the dustless carbon black patents or to engage in the successful manufacture of the product. In short, we do not find that the attorney violated his professional duty to the plaintiff by accepting employment from the defendants in a different field.

## 2. The Plaintiff's Claim for Minimum Royalties.

 The facts pertinent to this aspect of the plaintiff's case are not in dispute and we are concerned only with their legal effect.

Under the license agreements executed on August 18, 1936, but dated July 31, 1936, the plaintiff was granted all the class "A" common stock of Microid, 3000 shares. The remaining capital stock of Microid, 6000 shares of class "B" stock, was issued to United, Inc. The class "A" stock was preferred over the class "B" stock to the extent that no dividends could be declared or paid on the latter during any fiscal year unless during the same year dividends amounting to $12,000 had been declared on or paid to the holders of class "A" stock, except that during the first year, August 1, 1936, to July 31, 1937, the class "A" stock was to be preferred only to the extent of $7,500. The plaintiff also agreed to serve as director of technical research of Microid for a period of five years without compensation. The license agreements themselves made no other provision for the remuneration of the plaintiff.

By the agreement between the plaintiff and United, Inc., the latter agreed that, if Microid did not have the necessary funds, United, Inc., "so long as it retains the right to use a license, bearing even date herewith granted by Microid to United, shall advance the funds necessary to pay * * * such expenses as Microid shall have incurred by order of its board of directors."

On August 18, 1936, the same day on which the license agreements were executed, the board of directors of Microid passed the following resolution:

"Resolved, that the officers of the Company be, and they are hereby authorized and directed to pay to Mr. deStubner the sum of Six Hundred and Twenty-Five Dollars ($625) per month, *as per contract,* such payments to begin with the month of August, 1936, and to be made on or about the last day of each month." (Emphasis supplied)

It will be noted that $625 per month equals $7500 per year, and this was precisely the amount to which the class "A" common stock was to be preferred during the first year. On the same day Oscar Nelson wrote to the plaintiff, stating, in part, as follows:

"This letter is to evidence our understanding that the sums payable to you *as or in lieu of prior dividends on the class 'A' stock of this Corporation* (Microid) heretofore issued to you as set forth in the written agreement between us dated July 31, 1936, are to be paid to you in equal monthly amounts on or before the last day of each month beginning in August, 1936." (Emphasis supplied)

In 1938 a controversy developed between the plaintiff and United, Inc., as to whether he should receive $625 or $1,000 per month. This controversy was ultimately resolved in the following manner: On May 27, 1938, an agreement was executed between United, Inc., Microid, and the plaintiff on the one hand, and the Charles Hellmuth Printing Ink Corporation on the other, whereby the latter was given an option for one year to secure a license for the use of the plaintiff's patents and inventions. On July 12, 1938, the plaintiff and Microid entered into an agreement whereby Microid agreed to pay to the plaintiff $625 per month during the life of the Hellmuth option, with the proviso that when this option was either exercised or terminated, "the schedule of payments specified in paragraph 3b of said agreement of July 31, 1936, shall be reinstated."

In March of 1939 the plaintiff instituted proceedings in the courts of West Virginia to cancel the license agreements of July 31, 1936, alleging that United, Inc., and Microid had failed to exploit his inventions and that they had been guilty of fraudulent misrepresentations towards him. United, Inc., and Microid resisted this suit and also refused to make any further payments to the plaintiff. The case ultimately reached the Supreme Court of Appeals of West Virginia. This court found against the plaintiff with respect to his allegations of fraud, failure to exploit, etc., but held that the license from the plaintiff to Microid should be cancelled because of Microid's insolvency. The court refused to cancel the sub-license from Mi-

croid to United, Inc., ruling that the plaintiff should be substituted for Microid as the licensor under the sub-license with respect to United, Inc. This action was taken pursuant to the terms of the sub-license which expressly declared that, should the master license be cancelled, the plaintiff should be substituted for Microid under the Microid-United, Inc., sub-license. The decree of the court became effective on August 1, 1942, and on August 7, 1942, the plaintiff surrendered his stock in Microid. See De Stubner v. Microid Process, Inc., 124 W.Va. 591, 21 S.E.2d 154.

Shortly thereafter, the plaintiff instituted another action against United, Inc., and Microid, seeking to recover $1,000 per month as minimum royalties from March, 1939 on which date United, Inc., and Microid refused to make additional payments to the plaintiff as a result of the suit initiated by him in that month. This case also reached the Supreme Court of Appeals of West Virginia. De Stubner v. United Carbon Co., Inc., 126 W.Va. 363, 28 S.E.2d 593. The court construed the agreement of July 12, 1938, between the plaintiff and Microid as imposing an obligation on Microid to pay to the plaintiff the sum of $625 per month during the life of the Hellmuth option, and the sum of $1,000 per month following either the exercise or the termination of that option. Inasmuch as Microid has been dissolved and, consequently, is not a party to this suit, that aspect of the decision is not material here. The court further found that the agreement of July 12, 1938, did not impose any added obligation on United, Inc.

However, the court was of the opinion that the resolution of the board of directors of Microid on August 18, 1936, authorizing payments of $625 per month to the plaintiff, should be read into the license agreements and was in fact part of the consideration for those agreements, especially as the resolution was passed on the very day that the licenses were executed. And, in view of the promise of United, Inc., in its contract with the plaintiff to provide funds if necessary to pay "such expenses as Microid shall have incurred by order of its board of directors", the court concluded

that the resolution of August 18, 1936, imposed an obligation on United, Inc., to pay the plaintiff $625 per month. The court, therefore, entered a judgment against United, Inc., and Microid to pay plaintiff the equivalent of $625 per month from March, 1939 to August 1, 1942, when, under the court's decree, the master license from the plaintiff to Microid was cancelled.

The plaintiff now contends that he is entitled to $625 per month from United, Inc., since August 1, 1942. We are unable to agree. We think it is quite obvious that the payments authorized by the resolution of August 18, 1936, were to be in lieu of the minimum dividends to which the plaintiff was entitled on his class "A" stock and for the non-payment of which he could cancel the license to Microid. Thus, the resolution itself speaks of payments "as per contract" and Nelson's letter of the same date refers to the payments "as or in lieu of prior dividends on the class 'A' stock." But when the plaintiff surrendered his class "A" stock on August 7, 1942, following the cancellation of the master license as of August 1, 1942, he obviously was no longer entitled to the dividends on this stock; and it must follow that he was no longer entitled to the payments which were made to him in lieu of the dividends. When the master license was canceled the plaintiff stepped into the shoes of Microid. He then became entitled to royalties under the sub-license from United, Inc., but he necessarily surrendered his right to dividends, or payments in lieu of dividends, under the master license which he himself set aside. United, Inc., was obligated to the plaintiff up to August 1, 1942, as a guarantor of Microid's liability expressed in the resolution of August 18, 1936. But after August 1, 1942, Microid's obligation was effaced except for monies past due.

The plaintiff relies upon the language of the agreement between him and United, Inc., wherein United, Inc., promised to advance funds to pay such expenses as Microid should authorize by order of its board of directors "so long as it (United, Inc.) retains the right to use a license, bearing even date herewith, granted by Microid to United." Since the sub-license

remained in effect after August 1, 1942, the plaintiff contends that the obligation of United, Inc., under the 1936 resolution was likewise continued. But in view of the considerations set out above, we believe that this quoted language was intended to put an end to the liability of United, Inc., in case it terminated the sub-license prior to the expiration of the master license, rather than to expand its liability under the sub-license so as to survive the master license. Microid's obligation under the resolution to continue to pay the monthly sum of $625 ceased upon the cancellation of its license from the plaintiff. This conclusion is in no way inconsistent with the decision of the Supreme Court of Appeals of West Virginia, as is shown by the following quotation from the court's opinion:

"In these circumstances it seems that United, Inc., became and was bound by express contract to pay plaintiff the sum of six hundred twenty-five dollars a month from August, 1936, *until* De Stubner was substituted as licensor to Microid under paragraph (7) of the De Stubner-Microid agreement when the decision of this Court in the equity suit became final on August 1, 1942." (Emphasis supplied)

3. The Plaintiff's Claim for Royalties for the Use of His Patents and Inventions Relating To Pigment Dispersions.

■■■■■ United, Inc., admits that it became liable to the plaintiff under the agreements for the use of his patents and inventions pertinent to the art of pigment dispersion, but asserts that its liability in this respect is offset by advances made by it to or for the account of Microid which, under the sub-license agreement, it was entitled to credit upon the royalties due. The District Court in its final decree dismissed all other claims of the plaintiff but referred this matter to the special master for an accounting. Subsequently, when the plaintiff announced that he was unable to furnish security for the costs of reference, the court set aside this portion of the decree. The plaintiff objected to this action at the time but has not raised the

point in this court. For this reason the point may be disregarded in the opinion, but it may be added that the evidence reveals that the advances made by United, Inc., largely exceeded the profits on the sales, and hence the court was well within its discretion in requiring that the plaintiff put up security for costs as a condition precedent to the reference. Kinney v. Plymouth Rock Squab Co., 236 U.S. 43, 35 S.Ct. 236, 59 L.Ed. 457; Prince v. Klune, 80 U.S.App.D.C. 31, 148 F.2d 18; Long v. Stites, 6 Cir., 63 F.2d 855, certiorari denied 290 U.S. 640, 54 S.Ct. 59, 78 L.Ed. 556.

Affirmed.